NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY & another *vs.* CITY OF CHELSEA & others.

Suffolk.    September 10, 1912. — October 16, 1912.

Present: RUGG, C. J., HAMMOND, BRALEY, & DECOURCY, JJ.

*Railroad,* Location.    *Chelsea.*

Abandonment by a railroad corporation of its location or of any part thereof is not to be inferred from mere non-user.

This suit in equity by a railroad corporation and its lessee to establish their rights in a certain location through certain streets of the city of Chelsea was referred to a master who at considerable length made findings of subsidiary facts and also general findings, based on such subsidiary facts, that no abutter had acquired or had any right or interest in any part of the location referred to by reason of any adverse use or occupation thereof, that there had been no abandonment or modification of the location which reduced its width to less than that described in the bill, and that the location was valid to that width. On appeal from a decree granting the prayers of the bill, it was *held*, after a review of the master's report, that the general findings of the master were justified by the subsidiary facts found by him, and that therefore the appeal should be dismissed.

BILL IN EQUITY, filed in the Supreme Judicial Court on August 30, 1911, by the New York Central and Hudson River Railroad Company and the Boston and Albany Railroad Company against the city of Chelsea and the commissioners constituting the Chelsea board of control appointed under the provisions of St. 1908,

c. 559, seeking to establish the rights of the plaintiffs in a location through certain streets in the defendant city.

The suit was referred to Patrick H. Cooney, Esquire, as master. Among findings in his report which are not described in the opinion were the following:

St. 1900, c. 468, empowered the Boston and Albany Railroad to make the lease to the New York Central and Hudson River Railroad Company, which they did on July 1, 1900, of "all and singular its railroads and property of every description."

By deed of December 17, 1869, the Eastern Railroad Company conveyed to the Boston and Albany Railroad "the mortgage deed given by the Grand Junction Railroad and Depot Company to said Eastern Railroad Company, dated March 22, 1852, and all and singular the negotiable bonds, debts, claims, and demands therein mentioned or thereby secured, and all the rights, titles, and interests of the Eastern Railroad Company in and to the real estate thereby conveyed so far only as the Eastern Railroad Company have acquired any interest therein under and by virtue of said mortgage, not including, but especially excepting from this assignment, any and all rights, title, and interest or estate acquired by said Eastern Railroad Company in any other manner or by any other title, but including all rights, title, and interests by possession of the mortgaged premises obtained by open and peaceable entry thereon by the Eastern Railroad Company on the 6th day of May A. D. 1862, for breach of the condition of said mortgage, not opposed by the said mortgagors or any other person claiming the premises, and continued peaceable for more than three years and even since said day."

The Winnisimmet Company by deed of February 15, 1853, purported to convey to the Grand Junction Railroad and Depot Company the fee to the roadbed of the grantee "as now built and to be built."

The findings of the master as to fences put upon the location were as follows:

"Some years after the railroad was built a fence was built and for many years maintained in a more or less dilapidated condition on a line substantially thirteen feet southerly from the base line of the location, and on the line of the deed from the Winnisimmit Company to the Grand Junction Railroad and Depot Company,

dated February 15, 1853, and about thirty years ago another fence was built over a part, at least, of the location, but it was three or four feet southerly from the first fence. In 1899 another fence was built forty-one and one fourth feet southerly from the base or center line of the location of October 20, 1849, and after the agreement for compromise was made in 1903, still another fence was built twenty-eight feet southerly from said base line and on the line established by the compromise. All of these fences were built by the railroad. The land on which they were built was wet, marshy land, and so far as any use was made of it, it was used chiefly for pasturing."

The compromise made in the year 1903 is described by the master as follows: "In 1903, a dispute arose between the Boston and Albany Railroad Company and the various abuttors as to the southerly line of the railroad location, the railroad claiming that it was forty-one and one fourth feet southerly from, and parallel with, the base or center line of the location filed October 20, 1849, and the various abuttors claiming that it was but thirteen feet southerly from said line, being the line of the first tract described in the deed from the Winnisimmit Company to the Grand Junction Railroad and Depot Company, dated February 15, 1853; and the parties finally agreed, as a matter of mutual compromise, to establish the line twenty-eight feet southerly from, and parallel with, said base line, except for a short distance southwesterly of Spruce street, it was established thirty feet southerly from said base line; and to carry into effect said compromise agreement the parties interchangeably executed the necessary releases. One William Williams, who owned a triangular piece of land with a house on it on Vale street, is the only abuttor who did not join in the compromise or execute any release. His land has a boundary of eighty-five feet on the railroad, and the northeasterly corner of the ell of his house stands twenty-six and ninety-eight one hundredths feet southerly from the base or center line of the railroad. Vale street does not cross the railroad, but it leads to it."

The substance of the other facts reported by the master is stated in the opinion.

The suit was heard upon the master's report by *Hammond*, J., and a decree was made for the plaintiffs. The defendants appealed.

The evidence was not reported.

*H. W. James,* for the defendants.

*R. A. Stewart,* for the plaintiffs, was stopped by the court.

HAMMOND, J.  By this bill the plaintiffs seek to establish the location of the Grand Junction branch of the Boston and Albany Railroad at least twenty-eight feet in width over certain lands and public streets in the city of Chelsea, and ask for an injunction against any interference upon the part of the defendants, their officers, agents and servants, with the lawful acts of the plaintiffs upon such location.  The defendants deny the validity of the location, and especially insist that even if there be a valid location its width is only thirteen instead of twenty-eight feet.  The case was referred to a master, to hear the parties and to report his findings, "together with such facts and matters of law as either party" might request.

The master's report, to which no exceptions were taken, was confirmed, and thereupon there was a final decree for the plaintiffs; and the case is before us upon the defendants' appeal from that decree.  Inasmuch as there were no exceptions to the report the only question open to the defendants is whether the decree is justified by the record.

After stating at considerable length the subsidiary facts found by him, the master makes three general findings, based, as he says, upon these subsidiary facts.  These general findings are in substance that (1) "no abuttor acquired, or has any right or interest in, any part of the location . . . by reason of any adverse use or occupation thereof;" (2) that there has been no abandonment or modification of the location which reduces its width to less than twenty-eight feet; and (3) that the location is valid to the width of twenty-eight feet.  If these general findings of fact are to stand, then the final decree was proper; and hence the only question before us is whether they shall stand, or, in other words, whether they are justified upon the subsidiary facts with the legitimate inferences therefrom.

On October 20, 1849, the Grand Junction Railroad and Depot Company duly filed a location five rods wide, "and the railroad was built on . . . [this] . . . location over the part thereof now in controversy."  On March 22, 1852, the same company mortgaged to the Eastern Railroad Company all that portion of its railroad (describing it) including "the superstructure thereof, and

all . . . [its] . . . rights, title and interest . . . in the land over which the same is located and with the rights, privileges and appurtenances to said portion of said road . . .; also . . . [its] . . . franchise . . . so far as the same extends or applies." The location in question is a part of the railroad mortgaged and is within the description. This mortgage was a valid mortgage. *East Boston Freight Railroad* v. *Eastern Railroad,* 13 Allen, 422. "The condition of this mortgage was broken, and for such breach of condition the Eastern Railroad Company, on the 6th day of March, 1862, made an open and peaceable entry upon the mortgaged premises for the purpose of foreclosing said mortgage, and recorded in the registry of deeds a certificate of said entry in due form within thirty days after said entry was made; and the said Eastern Railroad Company, and its successors and assigns have since been, and are now, in possession of the same under said mortgage title." In this way the mortgage was foreclosed, and by various acts and contracts under legislative authority this title, except so far as modified by subsequent takings, passed to the plaintiff the Boston and Albany Railroad Company and was included in its lease to the other plaintiff. See St. 1900, c. 468, and also the various agreements described in the report, especially that of December 17, 1869, between the Boston and Albany Railroad and the Eastern Railroad Company and the lease of July 1, 1900, between the former company and the other plaintiff.

The validity of this location is attacked by the defendants on various grounds. The first ground is that no compensation ever was paid to the owners of the land over which the location was made. But this contention is not sustained by the report. The master nowhere makes such a finding, and at this late day no such inference is to be drawn from the facts stated by him. The second ground is that the taking was modified as to width by the deed of February 15, 1853, from the Winnisimmet Company to the Grand Junction Railroad and Depot Company. But it is to be noted that that deed was executed several months after the mortgage to the Eastern Railroad Company, and whatever might have been the legal effect of the deed as between the parties to it, as to which we express no opinion, it is manifest that it could not affect the rights of the mortgagee without its consent. *Ellis*

v. *Boston, Hartford & Erie Railroad,* 107 Mass. 1. *Haven* v. *Adams,* 4 Allen, 80. There is no evidence of any such assent at that or any subsequent time.

It is further contended by the defendants that there has been an abandonment of the part of the location in controversy. In determining what acts constitute an abandonment of a railroad location it is important to bear in mind the nature of the right acquired. This right, though technically an easement, may require for its enjoyment permanent and practically exclusive use of the land. The extent to which the land to the width of five rods is needed for the operations of the railroad is a matter upon which the officers of the company are the sole judges; and it varies at their discretion with the business necessities of the company. *Brainard* v. *Clapp,* 10 Cush. 6. *Proprietors of Locks & Canals* v. *Nashua & Lowell Railroad,* 104 Mass. 1. *Barnes* v. *Boston & Maine Railroad,* 130 Mass. 388. *Lorain Steel Co.* v. *Norfolk & Bristol Street Railway,* 187 Mass. 500. In *May* v. *New England Railroad,* 171 Mass. 367, 369, Allen, J., uses the following language: "Where land is taken for a railroad, the original owner retains all his rights which are consistent with the full enjoyment of the easement acquired by the railroad company. The two rights exist together, and the railroad company is not legally injured by any use of the land by the owner which does not interfere with the easement taken. . . . With growing needs the company's right of use may increase, and that of the original owner may decrease. The railroad company is not limited in its right by the use which it makes at the outset, and it may determine from time to time how large a use is required. . . . So long as its uses of the land or its needs are not interfered with, no legal right to which it is entitled is violated, and it has no occasion to institute any proceedings at law or in equity to establish or vindicate such right. A respondent will not be required to bring a suit unless it is made to appear that the right which he claims can be fairly and conclusively tried by such a suit as may be directed."

Abandonment is not to be inferred from mere non-user, nor necessarily from the facts recited by the master as to fences put up on the location. It is clear that the master was justified in coming to the conclusion that there was no abandonment.

It follows that upon neither of the grounds thus urged by the defendants is the location shown to be invalid.

By the report it appears that various proceedings have taken place with reference to this land, but it is unnecessary to go through them in detail. It is enough to say that whatever rights were acquired, either by this location or otherwise, to the land situated south of the centre line of the location, being a strip two and one half rods wide, they were in the Boston and Albany Railroad Company in 1903, when the compromise of that year was made, and that the modification under that compromise did not lessen the width of the strip to less than twenty-eight feet.

The subsidiary facts not only justify the general findings, but seem to be inconsistent with any other result.

*Decree affirmed.*